---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

JACKIE L. WARD, JR.,

Plaintiff-Appellee,

v.

CORRECTIONAL OFFICER NORTON,

Defendant-Appellant.

Appeal from the United States District Court for the Middle District of Florida
Case No.: 6:21-cv-01887-PGB-DCI

---

## APPELLANT'S INITIAL BRIEF

---

W. KEVIN BLEDSOE, ESQ.
Deputy County Attorney
Fla. Bar No.: 0029769
SARAH JONAS, ESQ.
Assistant County Attorney
Fla. Bar No.: 115989
123 W. Indiana Ave.
DeLand, Florida 32720
(386) 736-5950
Counsel for Defendant-Appellant

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, counsel for Appellant certify that the following persons have or may have an interest in the outcome of this case:

1.  Bledsoe, W. Kevin - Counsel for Defendant/Appellant

2.  Byron, Paul G. - United States District Judge

3.  County of Volusia - Employer of Appellant

4.  Jonas, Sarah - Counsel for Defendant/Appellant

5.  Norton, James - Defendant/Appellant.

6.  Ward, Jackie L., Jr. - Plaintiff/Appellee

7.  Weiss, Samuel - Counsel for Plaintiff/Appellee

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellant Correctional Officer Norton (Norton) respectfully requests oral argument pursuant to Federal Rule of Appellate Procedure 34(a) and Eleventh Circuit Rule 28-1(c). This case presents important issues regarding whether a corrections transport officer can be denied qualified immunity in a lawsuit alleging deliberate indifference to a serious medical need for not providing immediate medical care to an inmate after a routine slip and fall resulting in no head injury, no bleeding, no broken bones, no loss of consciousness, and no life-threatening injury. Norton believes oral argument could assist this Court in making its determination.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS.................................................C-1

STATEMENT REGARDING ORAL ARGUMENT..................................................i

TABLE OF CONTENTS ........................................................................ ii

TABLE OF CITATIONS.......................................................................iv

JURISDICTIONAL STATEMENT ..................................................... viii

STATEMENT OF THE ISSUES ...................................................................1

STATEMENT OF THE CASE......................................................................2

    I.      Course of Proceedings and Disposition in the Court Below................2

    II.     Statement of Facts ................................................................2

    III.    Statement of the Standard or Scope of Review for Each
           Contention .....................................................................14

SUMMARY OF THE ARGUMENT ...................................................15

ARGUMENT ...............................................................................16

    I.      NORTON DID NOT VIOLATE WARD'S CONSTITUTIONAL
          RIGHT BY NOT PROVIDING IMMEDIATE MEDICAL CARE
          AFTER HIS SLIP AND FALL...........................................16

          A.     Ward Did Not Have an Objectively Serious Medical Need. ....17

          B.     Norton Did Not Act with Subjective Deliberate Indifference
               to Ward's Serious Medical Need...............................22

          C.     Ward Did Not Suffer Injury Caused by Norton's Failure
               to Provide Immediate Medical Care. ........................24

    II.     THE DISTRICT COURT ERRED IN FINDING THAT WARD
          HAD A CLEARLY ESTABLISHED CONSTITUTIONAL RIGHT
          TO RECEIVE IMMEDIATE MEDICAL CARE FROM NORTON..25

    A.     No Factually Analogous Case Law Provided Norton with
          Notice that His Conduct Violated Ward's Clearly
          Established Constitutional Right. ..............................................26

    B.     Eleventh Circuit Precedent Shows that Norton's Conduct
          *Did Not* Violate a Clearly Established Constitutional Right. ...27

    C.     The District Court Erred in Concluding It Was "Constrained"
          by *Patel* and *Brown* Despite Recognizing That *Wade v. United
          States* is Analogous to the Instant Case. ...................................29

    D.     Qualified Immunity Protects Corrections Officers Like
          Norton While Performing Inherently Dangerous Tasks. ..........36

CONCLUSION .......................................................................................................38

CERTIFICATE OF COMPLIANCE .......................................................................39

CERTIFICATE OF SERVICE ................................................................................39

# TABLE OF CITATIONS

**Cases**                                                                **Page(s)**

*Aldridge v. Montgomery*,
753 F.2d 970 (11th Cir. 1985)...................................................... 18, 24, 27, 28, 35

*Ancata v. Prison Health Servs., Inc.*,
769 F.2d 700 (11th Cir. 1985) .................................................................. 32, 33

*Andujar v. Rodriguez*,
486 F.3d 1199 (11th Cir. 2007) ........................................................................34

*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011) .........................................................................................26

*Bennett v. Parker*,
898 F.2d 1530 (11th Cir. 1990).........................................................................36

*Bozeman v. Orum*,
422 F.3d 1265 (11th Cir. 2005)................................................................... 32, 34

*Brown v. Hughes*,
894 F.2d 1533 (11th Cir. 1990).........................................................................34

*Burley v. Upton*,
257 Fed. App'x. 207 (11th Cir. 2007) ...............................................................20

*Cockrell v. Sparks*,
510 F.3d 1307 (11th Cir. 2007) ........................................................................36

*Coffin v. Brandau*,
642 F.3d 999 (11th Cir. 2011) .............................................................. 26, 30, 37

*Dukes v. Deaton*,
852 F.3d 1035 (11th Cir. 2017) ........................................................................29

*Denno v. Sch. Bd. of Volusia, Cnty., Fla.*,
    218 F.3d 1267 (11th Cir. 2000)..........................................................37

*Echols v. Lawton*,
    913 F.3d 1313 (11th Cir. 2019) .......................................................34

*Farmer v. Brennan*,
    511 U.S. 825 (1994) ........................................................................23

*Farrow v. West*,
    320 F.3d 1235 (11th Cir. 2003)..........................................................17

*Fernandez v. Metro Dade Police Dep't*,
    397 Fed. App'x. 507 (11th Cir. 2010) .........................................18, 19

*Florence v. Board of Chosen Freeholders of Cnty of Birmingham*,
    566 U.S. 318 (2012)..........................................................................36

*Gaines v. Wardynski*,
    871 F.3d 1203 (11th Cir. 2017)..........................................................26

*Gilmore v. Hodges*,
    738 F.3d 266 (11th Cir. 2013) ...........................................................17

*Goodman v, Kimbrough*,
    718 F.3d 1325 (11th Cir. 2013) ....................................................23, 24

*Hill v. Dekalb Reg'l Youth Det. Ctr.*,
    40 F.3d 1176 (11th Cir. 1994)........................................ 17, 20, 21, 24

*Hinson v. Bias*,
    927 F.3d 1103 (11th Cir. 2019) .........................................................20

*Hoffer v. Sec'y, Florida Dep't of Corr.*,
    973 F.3d 1263 (11th Cir. 2020) .........................................................24

*Keohane v. Florida Dep't of Corr. Sec'y*,
   952 F.3d 1257 (11th Cir. 2020) ..........................................................22

*King v. Pridmore*,
   961 F.3d 1135 (11th Cir. 2020) ................................................. 29, 30

*Lee v. Ferraro*,
   284 F. 3d 1188 (11th Cir. 2002) .........................................................14

*Lewis v. City of W. Palm Beach*,
   561 F.3d 1288 (11th Cir. 2009) ....................................................16, 26

*Mann v. Taser Int'l, Inc.*,
   588 F.3d 1291 (11th Cir. 2009) .........................................................24

*Patel v. Lanier County Georgia*,
   969 F.3d 1173 (11th Cir. 2020) ............................................. 31, 32, 33

*Pearson v. Callahan*,
   555 U.S. 223 (2009) ................................................................. 16, 28

*Smith v. Mattox*,
   127 F.3d 1416 (11th Cir. 1997) .........................................................37

*Turner v Safley*,
   482 U.S. 78 (1987) ............................................................................36

*Wade v. United States*,
   13 F. 4th 1217 (11th Cir. 2021) .................................... viii, 27, 28, 30, 34

*White v. Pauly*,
   580 U.S. 73 (2017) ............................................................................26

*Willingham v. Loughnan*,
   261 F.3d 1178 (11th Cir. 2001) .........................................................36

## Statutes

28 U.S.C. § 1331 ............................................................................................... viii

42 U.S.C. § 1983 ............................................................................................... viii

# JURISDICTIONAL STATEMENT

The United States District Court, Middle District of Florida had subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the suit alleged civil rights violations pursuant to 42 U.S.C. § 1983. This Court has interlocutory jurisdiction when the denial of a motion for summary judgment asserting qualified immunity is based even in part on disputed issues of law. When an appeal concerns whether the undisputed facts in the record show a violation of a clearly established law, this Court has jurisdiction. *Wade v. United States*, 13 F.4th 1217, 1223-24 (11th Cir. 2021).

On March 15, 2024, the District Court entered an Order denying Appellant's motion for summary judgment asserting qualified immunity. (Doc. 68.) On March 26, 2024, Appellant Norton filed a timely Notice of Interlocutory Appeal. (Doc. 69.)

## STATEMENT OF THE ISSUES

1.      Whether the District Court erred in finding that the summary judgment evidence established that Norton was deliberately indifferent to an objectively serious medical need of Ward sufficient to violate Ward's constitutional rights.

2.      Whether the District Court erred in concluding that Ward had a clearly established constitutional right to receive immediate medical care from a transport officer who drove Ward between adjacent correctional facilities after Ward slipped from the transport van but suffered no head trauma, no loss of blood, no broken bones, and no loss of consciousness.

## STATEMENT OF THE CASE

Norton seeks reversal of the District Court's denial of his motion for summary judgment based on qualified immunity.

### (i)    Course of Proceedings and Disposition in the Court Below

Appellee Jackie L. Ward, Jr. (Ward) filed an Amended Complaint alleging violations of civil rights against Volusia County Corrections Director Flowers, Norton, contracted healthcare provider Centurion Health Services, and Nurse Nicastro of Centurion Health Services. (Doc. 7.)  The District Court granted the motions to dismiss filed by all defendants except Norton. (Doc. 40.)

Following discovery, Norton filed a Motion for Summary Judgment and Memorandum of Law asserting qualified immunity. (Doc. 58.)  Ward filed his Response in Opposition to Norton's Motion for Summary Judgment (Doc. 62) and Norton filed a Reply to Ward's Response. (Doc. 63.)

On March 15, 2024, the District Court entered its Order denying Norton's Motion for Summary Judgment. (Doc. 68.)  On March 26, 2024, Norton filed a timely Notice of Interlocutory Appeal. (Doc. 69.)

### (ii)    Statement of Facts

Norton agrees that the Factual Background provided by the District Court accurately summarizes the summary judgment facts. (Doc 68 at 4-14.)  The

following summary judgment facts are undisputed or presented in the light most favorable to Ward:

### *Ward slips while exiting a prisoner transport van at 8:14 a.m.*

In the morning of July 8, 2021, pretrial detainee Ward was transported from the Volusia County Correctional Facility to the Volusia County Branch Jail to attend a zoom meeting with his attorney. (Doc. 58-5, Ward Dep. 31:15-32:11.) The Correctional Facility and Branch Jail are separate structures on adjoining property. (*Id.* at 29:24-30:2.) The driving distance is about a quarter mile and the drive takes less than a minute. (Doc. 58-1, Norton Aff. ¶ 7; Doc. 58-2, Bordas Aff. ¶ 8.) Norton was the correctional officer who drove inmates between the Correctional Facility and the Branch Jail on July 8, 2021. (Doc. 58-5, Ward Dep. 53:21-54:6.)

While exiting the transport van at 8:14 a.m., Ward slipped in the Branch Jail vehicle sallyport. (Doc. 58-2, Bordas Aff. ¶ 5.) Ward was handcuffed to another inmate who exited the van first without issue. (Doc. 58-5, Ward Dep. 38:5-19.) The interior floor of the van was about two feet off the ground with a step that sits one foot off the ground. (Doc. 58-2, Bordas Aff. ¶ 9; Doc. 58-1, Norton Aff. ¶ 3.)

  

(Doc. 58-1, Norton Aff. Ex. A.)

Stepping off the van, Ward twisted his knee and fell on his tailbone. (Doc. 58-5, Ward Dep. 39:1-17.) Ward recalls that when his right foot slipped, he lunged for Norton and Norton backed away. (*Id.* at 40:14-41:8; 42:2-17.) The inmate handcuffed to Ward recalls that as Ward began to exit the vehicle he slipped, and Norton stepped back to avoid Ward as he reached out to steady himself. (Doc. 62-3, Dadd Aff. at 2.)

Ward did not know Norton before that day. (Doc. 58-5, Ward Dep. 35:21-23.) There was no hostility or animosity between Norton and Ward. (*Id.* at 35:21-36:6, 40:14-24.) Norton maintains that he did not appreciate that Ward had a serious medical need that posed a substantial risk of serious harm if left unattended. (Doc. 58-1, Norton Aff. ¶ 5.) Although Ward avers he had "some scratches and stuff," he was not bleeding. (Doc. 58-5, Ward Dep. 43:3-13.) Norton is not a medical professional and has no medical training. (Doc. 58-1, Norton Aff. ¶ 4.) The same is true for Ward. (Doc. 58-5, Ward Dep. 69:19-24.)

Ward believes his tailbone hit the concrete floor, but he was on the ground for only a short period of time after falling. (Doc. 58-5, Ward Dep. 41:24-42:17, 43:3-10.) The fall was "excruciatingly painful" to Ward. Ward was limping and believes "you could tell" he was injured. (*Id.* at 42:9-25.) After Ward fell, Norton asked Ward, "Are you going to be able to move?" Ward responded, "I think so." (*Id.* at 43:6-10.)

Ward was helped up by the inmate he was handcuffed to during transport. (*Id.*) According to Ward, while attempting to stand, he felt something "shift and pop in [his] back." (Doc. 62-11, Ward Aff. ¶ 8.) Ward maintains Norton denied his requests for medical care. (Doc. 62-11, Ward Aff. ¶ 7-8.)

### Ward meets with his attorney at the Branch Jail

Ward and his fellow inmates walked from the vehicle sallyport to a holding cell near the attorney visitation rooms. (Doc. 58-5, Ward Dep. 45:7-12; 46:15-25.) The inmate handcuffed to Ward helped him walk by supporting his weight. (Doc. 62-3, Dadd Aff. at 2.) Once in the holding cell, Ward was no longer handcuffed to the fellow inmate. (Doc. 58-5, Ward Dep. 45:22-46:12.) Norton was not responsible for supervising inmates in the holding cell or directing them to their meeting rooms. (*Id.* at 47:10-48:5; Doc. 58-1, Norton Aff. ¶ 6.) Norton had no contact with Ward or the other transported inmates until the Branch Jail control room officers announced the inmates were ready to return to the Correctional Facility. (Doc. 58-1, Norton Aff. ¶ 6.)

The holding cell door was left open while Branch Jail officers in the nearby control room called inmates' names and directed them to walk unescorted to the appropriate meeting room. (Doc. 58-5, Ward Dep. 47:1-6; 47:20-48:5.) When his name was called, Ward acknowledges being able to leave the holding cell and enter the attorney meeting room without assistance, albeit by hopping. (*Id.* at 48:6-11.)

The distance between the holding cell and the attorney visitation rooms with remote (zoom) capacity is approximately 40 to 50 feet. (Doc. 58-2, Bordas Aff. ¶ 10.)

Ward believes he might have told his attorney that he fell, but it "certainly was not" a focus of their conversation, which may have lasted 15 minutes. Ward did not ask his attorney to help him get medical attention. (Doc. 58-5, Ward Dep. 49:6-20.) After Ward spoke with his attorney, he notified the control officer or another officer in the Branch Jail and was directed to return to the holding cell. (*Id.* at 49:21-50:10.)

### Norton was *"just the transport guy"*

Ward agrees that Norton was "just transport that day." Other officers were responsible for Ward both at the Branch Jail and at the Correctional Facility:

Q: Norton was just the transport guy?

A: That's correct.

Q: You saw Norton when he drove up to the jail—I'm sorry, to the Branch Jail and saw him when he drove you back, correct?

A: In the sally port. He basically shows up to get you from sally port to sally port from each of the buildings. And then there's minimal interaction before and minimal after, as I recall. It's other officers that are responsible for you, he turns you over to – he was just transport that day.

(Doc. 58-5, Ward Dep. 53:21-54:6.)

After Norton drove Ward back to the Correctional Facility, Ward did not see Norton again that day. (*Id.* at 57:18-21.) Ward thinks he next saw Norton a month

or two later. (*Id.* at 57:23-58:5.) Norton estimates that he would have been in Ward's

presence for less than 10 minutes on July 8, 2021. (Doc. 58-1, Norton Aff. ¶ 8.)

### Ward returns to Dorm #2 at 11:31 a.m.

Ward was back in his Correctional Facility dorm by 11:31 a.m. (Doc. 58-5,

Ward Dep. 50:15-51:11; Doc. 58-2, Bordas Aff. ¶ 6; Doc. 58-1, Norton Aff. ¶ 9.) "I

was back by lunch." (Doc. 58-5, Ward Dep. 51:13.) Norton had no contact with

Ward after returning him to the Correctional Facility. (*Id.* at 57:18-25.) At the

Correctional Facility, Ward was housed in Dorm #2, an open bunk, barrack-style

dorm where inmates are not isolated in individual cells. (*Id.* at 31:6-14; Doc. 58-2,

Bordas Aff. ¶ 2.) Inmates in Dorm #2 are able to communicate with both officers

and medical staff. (Doc. 58-2, Bordas Aff. ¶ 2.) Inmates in Dorm #2 are readily

observed by the Housing Unit Officer and can interact with that officer at the officer

station. (*Id.*) Although Norton was not assigned to Dorm #2, he knew that inmates

in Dorm #2 have access to medical personnel. (Doc. 58-1, Norton Aff. ¶ 10.)

### Ward's contact with medical personnel in Dorm #2

When Ward returned to Dorm #2, he told officers that he was hurting. The

officers told him to talk to medical. (Doc. 58-5, Ward Dep. 53:14-18.) Around 11:30

a.m. or noon, Ward spoke to medical personnel about his fall. (*Id.* at 60:13-21.)

Ward explains that the initial medical personnel he spoke to—seen pushing a pill

cart and wearing stethoscopes—did not act upon his complaints. (*Id.* at 60:20-61:18.) Ward explains, "those girls were rude, man." (*Id.* at 58:19-23.)

Ward had "several interactions" with medical personnel after he fell, including a female nurse at the Branch Jail who told him to "keep it moving" as he walked to the holding cell before seeing his lawyer. (*Id.* at 59:21-60:12.) However, Nurse Nicastro was the first one who appeared to take his complaints seriously. (*Id.* at 61:19-23.) At approximately 7:55 p.m., Ward informed Nurse Nicastro that he slipped and twisted his right knee while exiting the transport van. (Doc. 58-2, Bordas Aff. ¶ 3.)

Nurse Nicastro prompted Dorm #2 Housing Unit Officer Bordas to complete an accident report. (Doc. 58-5, Ward Dep. 61:19-62-13; Doc. 58-2, Bordas Aff. Ex. A.) Before 7:55 p.m., Officer Bordas was unaware that Ward had slipped or claimed any injury despite serving as the Housing Unit Officer for approximately two hours. (Doc. 58-2, Bordas Aff. ¶ 4.) Once informed of the incident, Officer Bordas reviewed the Ocularis Camera System and confirmed that Ward slipped while exiting the transport van at 8:14 a.m. (*Id.* at ¶ 5.) Having reviewed the Ocularis Camera System and observing Ward, Officer Bordas did not feel that Ward had a serious medical condition that required immediate medical attention. (*Id.* at ¶ 7.)

Unless a video is saved, Ocularis security camera footage cannot be retrieved after 30 days. (Doc. 58-1, Norton Aff. ¶ 11.) Norton has neither the authority nor

the ability to preserve Ocularis security camera footage.  (*Id.*)  Norton did not know he was being accused of wrongdoing until after the Ocularis security camera footage became irretrievable. (*Id.*)

Apparently upon the orders of Nurse Nicastro, Ward was evaluated by Nurse Moreno at 11:05 p.m. (Doc. 58-5, Ward Dep. 63:11-64:1; Doc. 58-2, Bordas Aff. ¶ 7.)   Nurse Moreno documented: "pt stated that he fell off the transfer van coming from court and hurt his right knee is swollen.  No c/o pain at the moment." (Doc. 58-3, Silas Aff. ¶ 7.) However, Ward disputes that he told Nurse Moreno that he was not in pain. (Doc. 58-5, Ward Dep. 64:11-19.)  Nurse Moreno gave Ward Ibuprofen 600 mg around 11:28 p.m. on July 8, 2021, which he stopped receiving on July 15, 2021. (Doc. 58-3, Silas Aff. ¶ 8.)  Nurse Moreno requested an "xray on Monday to right knee."  Although the next Monday was in four days, the knee x-ray was taken on Monday, July 26, 2021. (*Id.* at ¶ 11.)

### *Courtroom Appearance on July 14, 2021*

Ward attended a court appearance on July 14, 2021, six days after he slipped while exiting the transport van.  (Doc. 58-4, Hubbell Aff. ¶ 2.)  Six days after the slip and fall, video shows Ward walking in and out of the courtroom unassisted with no detectable limp. (Doc. 67; Doc. 58-4, Hubbell Aff. ¶ 2, 4, Ex. A.)  Ward showed no difficulty standing during the 16 minutes he stood in the courtroom on July 14, 2021. (Doc. 67; Doc. 58-3, Silas Aff. ¶ 17; Doc. 58-4, Hubbell Aff. ¶ 5, Ex. A.)

  

(Doc. 67; Doc. 58-4, Hubbell Aff. ¶ 5, Ex. A.)

Six days after slipping while exiting the transport van, Ward showed no signs of distress verbally communicating with his attorney and the judge. (Doc. 67; Doc. 58-4, Hubbell Aff. ¶ 6, Ex. A.) Although Ward claims he was in pain during this court appearance (Doc. 62-11, Ward Aff. at 3), the District Court acknowledged that, in the video, Ward "appears to have no difficulty standing or walking" and "has no detectable limp." (Doc. 68 at 13.)

### *Attestation of Dr. Scott Silas*

Dr. Silas is a board-certified orthopedic surgeon who routinely treats patients with knee and lower back pain. (Doc. 58-3, Silas Aff. ¶ 1.) Dr. Silas reviewed the Amended Complaint, the accident report, medical records from both the Volusia County and the Florida Department of Corrections, the deposition of Ward, the courtroom video six days after the slip and fall, and jury instructions for deliberate indifference to serious medical need. (*Id.* at ¶ 2.) Dr. Silas opined that no evidence suggests Ward suffered a serious medical need that posed a substantial risk of serious harm if left unattended on July 8, 2021. (*Id.* at ¶ 3.) Dr. Silas noted that none of the

health care providers that encountered Ward that afternoon and evening determined that Ward required urgent or emergent medical care. (*Id.*)

The Ibuprofen given to Ward around 11:28 p.m. is a nonsteroidal anti-inflammatory drug (NSAID) indicated for the relief of mild to moderate pain. Ibuprofen (Motrin) is commonly used for conditions such as headaches, dental pain, muscle aches, fever, and minor aches and pains from acute injury or the common cold or flu. (*Id.* at ¶ 9.) The *month before* he slipped from the transport van, Ward was given the *same dose* of Ibuprofen 600mg—one tablet orally twice daily—from June 13, 2021 through June 19, 2021. Also before slipping from the van, Ward was prescribed Ibuprofen 400mg from May 14, 2021 through May 19, 2021, and 200mg from May 15, 2021 through May 22, 2021. (*Id.* at ¶ 10.) Dr. Silas attests that providing Ibuprofen does not suggest that Ward suffered a serious medical injury that posed a substantial risk of serious harm if left unattended on July 8, 2021. (*Id.*)

Dr. Silas notes that Ward did not suffer any broken bones, loss of blood, or significant injury on July 8, 2021, nor did he suffer any detrimental effect caused by a delay in medical treatment on that date. (*Id.* at ¶ 18.) Dr. Silas reviewed the video of Ward at his court appearance on July 14, 2021, six days after he slipped while exiting the transport van. The video shows Ward walking and standing without assistance with no outward signs of distress. (*Id.* at ¶ 17.)

### *X-ray of right knee taken July 26, 2021*

Dr. Silas opined that the x-ray of the right knee, dated July 26, 2021, does not suggest Ward suffered a traumatic injury. (*Id.* at ¶ 12.) The report notes the presence of chondrocalcinosis. The chondrocalcinosis was not indicative of a healing fracture or a traumatic injury two or three weeks earlier. (*Id.*) The x-ray showed no fracture or significant swelling suggesting a serious medical injury. (*Id.*) The knee x-ray does not suggest that Ward suffered a serious medical injury that posed a substantial risk of serious harm if left unattended on July 8, 2021. (*Id.*)

### *Ward's March 2022 diagnostic tests and assessment*

In March of 2022, a second x-ray of Ward's right knee revealed soft tissue swelling within the prepatellar space but no destructive process. (*Id.* at ¶ 13.) The findings redemonstrated mild changes associated with chondrocalcinosis. (*Id.*) Dr. Silas opined that the second knee x-ray does not suggest that Ward suffered a serious medical injury that posed a substantial risk of serious harm if left unattended on July 8, 2021. (*Id.*)

An x-ray of the lumbar spine was also taken in March of 2022. (*Id.* at ¶ 14.) The lumbar x-ray revealed scattered degenerative disc disease (DDD) and spurring worse at L4-5 and L5-S1. (*Id.*) Grade 2 spondylolisthesis at L4-5 with pars defect was also noted. (*Id.*) Dr. Silas explained that the findings suggest an age-related condition caused by the wear and tear of spinal discs and vertebra or a congenital

condition. (*Id.*) Dr. Silas opined that the lumbar x-ray does not suggest that Ward suffered a serious medical injury that posed a substantial risk of serious harm if left unattended on July 8, 2021. (*Id.*)

After the lumbar x-ray in March of 2022, Nurse Practitioner Clough assessed Ward with lumbar disc degeneration and spondylolisthesis. (*Id.* at 15.) She documented Ward "holding lower back while ambulating, not limping but does ambulate slowly." (*Id.*) She found no obvious weakness or deformity, and no complaints of deformity. (*Id.*) Nurse Clough documented, "patient states that some days are better than others." (*Id.*) The plan documented by Nurse Practitioner Clough included Naproxen 375mg (one tablet orally twice daily), Prilosec 20mg (one capsule orally at bedtime), and passes for a lower bunk, extra mattress, and a cane. (*Id.*)

Naproxen is a non-narcotic NSAID, and similar to Ibuprofen used for mild to moderate pain, body aches, and headaches, and Prilosec is used to treat heartburn symptoms. (*Id.* at 16.) Dr. Silas attests that the March 2022 assessment of Nurse Practitioner Clough does not suggest that Ward suffered a serious medical injury that posed a substantial risk of serious harm if left unattended on July 8, 2021. (*Id.*)

### *Ward's current condition*

In October of 2022, Ward was transferred from Volusia County to complete an eight-year state prison sentence. (Doc. 58-5, Ward Dep. 5:7-9; 8:23-9:3.)

Although Nurse Clough provided Ward a cane pass in March of 2022, Ward has not used a cane since he was transferred to state prison. (*Id.* at 79:19-80:18.) Besides pain relievers, Ward never received any medical treatment for his knee or his back on or after July 8, 2021. (*Id.* at 72:21-73:1.) In his May 2023 deposition, Ward acknowledged his "only complaints, really, are just the back now." (*Id.* at 73:5-7.) But Ward suffered previous back trauma and was normally under the care of the Veterans Administration. (Doc. 58-3, Silas Aff. ¶ 3; Doc. 7-3 at 6.)

In a February 2023 email to his friends, Ward wrote that "running is the foundation of my exercise routine." (Doc. 58-5, Ward Dep. Ex. E.) In the email, Ward complained that due to restrictions at the Central Florida Reception Center, he only "ran once 2 weeks ago for two miles," while "[n]ormal for me is to run 3 miles three times a week along with an isometric routine." (*Id.*) Ward acknowledges writing the email and running, but adds that the running was very painful. (Doc. 58-5, Ward Dep. 74:7-75:11.)

(iii) **Statement of the Standard or Scope of Review for Each Contention**

The denial of summary judgment based on an assertion of qualified immunity is reviewed *de novo* resolving all issues of material fact in favor of the plaintiff. *Lee v. Ferraro*, 284 F. 3d 1188, 1190 (11th Cir. 2002).

# SUMMARY OF THE ARGUMENT

The record evidence does not show that Ward suffered an objectively serious medical need. Ward suffered no broken bones, experienced no head trauma, had no loss of consciousness, and did not bleed. The record evidence does not show that Norton subjectively knew Ward had an urgent medical need substantially likely to be exacerbated by delayed medical treatment. Ward acknowledges that Norton was "just transport that day," delivering inmates "from sally port to sally port from each of the buildings." The record evidence does not establish injury to Ward caused by a delay in medical treatment attributable to Norton.

Norton is entitled to qualified immunity. The District Court erroneously felt constrained to deny qualified immunity to Norton despite acknowledging a similar Eleventh Circuit case finding no clearly established constitutional violation when a correctional officer did not provide medical care to an inmate with more obvious signs of injury. The District Court erroneously applied a broad principle instead of requiring factually analogous case law to establish that the constitutional right alleged by Ward was clearly established.

# ARGUMENT

It is undisputed that Norton was acting within the scope of his discretionary authority as a corrections officer during his encounter with Ward. Therefore, to overcome Norton's entitlement to qualified immunity, Ward bears the burden of demonstrating (1) that Norton violated his constitutional right, and (2) that the right was clearly established at the time of the violation. *See Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009). Because Ward must satisfy both prongs, this Court can consider them in either order. A finding that there was no constitutional violation moots the clearly established question. Similarly, a finding that the particular right was not clearly established moots the question of whether there was a constitutional violation in the first place. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The analysis of the two prongs necessarily overlaps. However, because Norton maintains neither burden has been met, both will be addressed in turn.

## I. NORTON DID NOT VIOLATE WARD'S CONSTITUTIONAL RIGHT BY NOT PROVIDING IMMEDIATE MEDICAL CARE AFTER HIS SLIP AND FALL.

Norton maintains that this case can be decided on the first, "violation" prong because the summary judgment evidence does not establish that Norton was deliberately indifferent to a serious medical need of Ward.

**A.  Ward did not have an objectively serious medical need.**

To prevail on a claim of deliberate indifference, a plaintiff must first establish an objectively serious medical need.  Even in the light most favorable to Ward, the summary judgment evidence does not establish that Ward suffered a serious medical need of constitutional proportion.

In the Eleventh Circuit, a serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (citing *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994)).  In either situation, the medical need "must be one that, if left unattended, poses a substantial risk of serious harm." *Id.*  "In general, serious medical needs are those requiring immediate medical attention." *Gilmore v. Hodges*, 738 F.3d 266, 274 (11th Cir. 2013) (internal quotation omitted).

No physician has ever diagnosed Ward with a serious medical need, neither during *nor after* his brief encounter with Norton.  Even considering the facts in the light most favorable to Ward, it wasn't "so obvious" that a lay person would "easily recognize" that Ward immediately needed a doctor's attention to prevent a "substantial risk of serious harm" during his encounter with Norton.

Ward slipped while stepping out of a van.  He didn't break any bones.  He suffered no head or facial injuries.  He wasn't bleeding.  Although Ward felt pain, he

was conscious and remained mobile with and without the assistance of his fellow inmate. Ward did not have a life-threatening injury or one that would obviously get worse without immediate medical attention. Video evidence confirms that Ward was walking, standing, and talking without difficulty six days after he slipped while exiting the transport van.

This Court found that a plaintiff did not establish a serious medical need and reversed a district court's rejection of qualified immunity in *Fernandez v. Metro Dade Police Dep't*, 397 Fed.Appx. 507 (11th Cir. 2010). The *Fernandez* plaintiff asserted that officers handcuffed him and then kicked him multiple times in the face, causing him to bleed from his nose and mouth, stepped on his face as he lay on the ground, stuck one of their thumbs under his chin to the point he almost fainted, punched him in the head and the ribs, and slammed his face into a vehicle's trunk. *Id.* at 509. Following this assault, the police took the plaintiff to the police station rather than providing medical assistance. *Id.* He remained at the police station "for about nine hours without water or medical treatment while he was in pain, confused, disoriented, and his nose was so full of blood 'clogs' that he had to breathe through his mouth." *Id.*

Concluding the plaintiff did not establish a serious medical need, the Eleventh Circuit in *Fernandez* noted that his subsequent treating physician only provided two Tylenol and the plaintiff "has not provided any medical evidence that his injuries

were serious enough to require medical attention any earlier than he received it." *Id.* at 514. *Fernandez* distinguished *Aldridge v. Montgomery*, 753 F.2d 970 (11th Cir. 1985), which found that facts precluded a directed verdict in a claim of deliberate indifference. Discussed in greater detail below, the plaintiff in *Aldridge* suffered a one and a half inch cut over his eye during an arrest. *Id.* at 971. The *Aldridge* plaintiff was then placed in a holding cell for over two hours while "[t]he cut continued to bleed, forming a pool of blood on the floor approximately the size of two hands." *Id.* The *Aldridge* plaintiff was then taken to the hospital where he received six stitches and prescribed icepacks and aspirin, neither of which was ultimately provided. *Id.* While the Court in *Fernandez* expressed no doubt that the plaintiff's injuries caused him pain and discomfort, the symptoms did not indicate a life-threatening condition or a situation where it was apparent that delay would detrimentally exacerbate the medical problem to a lay person. *Fernandez* at 514.

Here, there is no evidence that Ward had a substantial risk of serious harm unless Norton provided immediate medical care. None of the medical personnel Ward encountered that day provided urgent medical treatment, including the nurse he saw at the Branch Jail before seeing his attorney and the medical personnel Ward spoke to upon returning to the Correctional Facility starting around 11:30 a.m. to noon. Even the nurse that Ward credits for finally taking his complaints seriously at 7:55 p.m. directed another nurse to evaluate him three hours later at 11:05 p.m. That

nurse simply gave Ward a Motrin at 11:28 p.m. at the same dosage he got *the month before* the slip and fall. Nurse Moreno ordered a non-stat x-ray of his right knee which revealed no serious injury. Ward acknowledges that his right knee pain resolved on its own. Although Ward still complains of back pain, he acknowledges receiving medical care for back trauma prior to the slip and fall.

Determining the existence of a serious medical need, the Eleventh Circuit has noted that "lower back pain is not the type of serious condition this circuit requires." *Burley v. Upton*, 257 Fed.Appx. 207, 210 (11th Cir. 2007) (affirming defense summary judgment because plaintiff's medical need was not "so serious" that it posed a substantial risk of serious harm if left unattended). The Eleventh Circuit has additionally explained:

> Cases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem.

*Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d at 1187–88. Here, Ward did not have a life-threatening medical condition. It wasn't "apparent" that a delay by Norton would detrimentally exacerbate Ward's medical problem, and in hindsight, no exacerbation can be attributed to Norton.

In *Hinson v. Bias*, 927 F.3d 1103, 1112 (11th Cir. 2019), a detainee was thrown to the ground while being arrested, struck in the back by multiple officers,

and then while handcuffed fell to the ground as officers escorted him to a patrol vehicle. Hinson brought suit against the arresting officers, alleging constitutional violations of excessive force and deliberate indifference to a serious medical need. *Id.* The district court denied the officers' motion for summary judgment based on qualified immunity. *Id.* This Court reversed:

> Hinson has not identified evidence establishing a serious medical need constitutionally requiring more prompt treatment than Hinson received. As we have noted, Hinson unfortunately experienced skin abrasions on his face and a bruise on his knee. But Childers attested that when he interviewed Hinson at the police station following Hinson's arrest, Hinson was not actively bleeding. The video recording of Hinson's interview appears to corroborate Childers's assessment. And when Childers asked Hinson whether he was "alright," Hinson responded that he was.

*Id.* at 1122. Hinson's medical records did not reflect that he presented with a serious medical need, and while visiting his wife he did not tell her he was injured or that he needed medical attention. *Id.* Similarly, Ward fell but was not actively bleeding, Ward's medical records don't reflect a serious medical need, and Ward didn't tell his attorney that he needed medical attention shortly after the slip and fall.

The "seriousness" of an inmate's medical needs may be decided by reference to the *effect* of delay in treatment. *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d at 1188. "An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed. *Id.* Ward

can only speculate that earlier medical treatment may have somehow led to a better outcome. But Dr. Silas provided unrefuted medical evidence that Ward suffered no detrimental effect caused by a delay in medical treatment on July 8, 2021, much less any delay during Ward's transport between facilities.

The District Court noted that Ward claims "unknown damage to his lower back and right knee." (Doc. 68 at 5.) Neither Ward nor the District Court describe Ward's claimed injury with more specificity than "damage." Ward conceded as much in his Response in Opposition:

> What Ward actually needed to diagnose the serious medical injury was an MRI to show damage to the tendon. The failure to diagnose the serious medical injury to Ward's spine suggests a substantial risk of serious harm if left unattended.

(Doc. 62 at 2.) Ward's true complaint has always been that he should have received an MRI. (Doc. 7-3, p. 9.) But Norton was just the transport guy. Norton can't order an MRI. To the extent Ward believes his medical care was inadequate, those issues are not attributable to Norton.

### B. Norton did not act with subjective deliberate indifference to Ward's serious medical need.

A deliberate indifference claim entails both an objective and a subjective component. *Keohane v. Florida Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020). The Eleventh Circuit has explained that "to survive summary judgment on a deliberate indifference claim, the plaintiff must present some evidence of prison

officials' subjective awareness of a substantial risk of serious harm to the inmate." *Goodman v. Kimbrough*, 718 F.3d 1325, 1333–34 (11th Cir. 2013). Norton denies appreciating that Ward had a serious need that posed a substantial risk of serious harm if left unattended, and no record evidence counters his denial.

In the light most favorable to Ward, Norton witnessed him slip, knew he was in pain, and observed him limping afterward with the assistance of a fellow inmate. But an inference of *serious* injury does not naturally flow from witnessing an adult slip while stepping out of a van. Accepting Ward's account, his description of his slip is literally pedestrian. Having a painful limp shortly after slipping and falling a short distance is rather commonplace. No evidence suggests that Norton was subjectively aware that Ward could suffer serious harm unless he obtained medical treatment during their limited encounter on the morning of July 8, 2021. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (noting that "an official's failure to alleviate a significant risk that he should have perceived but did not" does not constitute deliberate indifference).

Notably, Ward acknowledges that Norton was "just the transport guy" who gets you "between sally port and sally port" with "minimal interaction before and minimal after." Norton did not isolate Ward. Norton did not prevent Ward from communicating with other officers, his attorney, or medical staff. Setting aside the nurse that Ward encountered at the Branch Jail, Ward was able to communicate with

medical personnel when he got back to Dorm #2 at 11:31 a.m. Norton knew Ward would have access to medical personnel in Dorm #2. Norton did not promise to get Ward medical attention and fail to deliver. Norton did not refuse to provide any treatment ordered by medical staff.

The Eleventh Circuit has reiterated that deliberate indifference is not a constitutionalized version of common law negligence. *Hoffer v. Sec'y, Florida Dep't of Corr.*, 973 F.3d 1263, 1271 (11th Cir. 2020). This Court has emphasized that "the deliberate indifference standard … is far more onerous than normal tort-based standards of conduct" and is in fact akin to "subjective recklessness as used in the criminal law." *Goodman*, 718 F.3d at 1334 (noting that the deliberate indifference standard is not a font of tort law or a brand of negligence redux). Deliberate indifference liability is typically imposed in cases presenting far more egregious circumstances. *See, e.g., Aldridge, supra*. Ward does not claim the degree of injury which typically results in deliberate indifference liability.

**C.    Ward did not suffer injury caused by Norton's failure to provide immediate medical care.**

To prevail on a claim of deliberate indifference to serious medical need, a plaintiff must show causation between the defendant's indifference and the plaintiff's injury. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009). As noted above, the unrefuted medical evidence is that Ward suffered no detrimental effect caused by a delay in medical treatment on July 8, 2021. Ward was only briefly

in Norton's custody and control. Norton was not the gatekeeper of Ward's medical care. Norton didn't prevent Ward from receiving medical attention. Therefore, any delay *attributable to Norton* is minimal.

When an inmate complains that delay in medical treatment rose to a constitutional violation, he "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Hill v. Dekalb Reg'l Youth Ctr.*, 40 F.3d at 1188–89 (noting that a four-hour delay in seeking treatment for stomach pain and vomiting blood did not worsen plaintiff's condition). Here, the only medical evidence on the subject is Dr. Silas's affidavit stating that Ward suffered no detrimental effect caused by a delay in medical treatment on July 8, 2021.

The District Court was silent on the causation element. Ward's response to this requirement is that he *should* have been given an MRI to *discover* the serious medical need. But Ward is not a medical expert, Norton can't order MRIs, and the record evidence does not establish a serious medical injury exacerbated by delay attributable to Norton.

## II.   THE DISTRICT COURT ERRED IN FINDING THAT WARD HAD A CLEARLY ESTABLISHED CONSTITUTIONAL RIGHT TO RECEIVE IMMEDIATE MEDICAL CARE FROM NORTON.

Even if this Court concludes that the summary judgment evidence established that Norton was deliberately indifferent to Ward's serious medical need, Norton

remains entitled to qualified immunity because the alleged constitutional violation was not clearly established. *See Lewis v. City of W. Palm Beach, Fla.*, 561 F.3d at 1291–92.

### A. No factually analogous case law provided Norton with notice that his conduct violated Ward's clearly established constitutional right.

The Supreme Court "has repeatedly told courts … not to define clearly established law at a high degree of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). In *White v. Pauly*, 580 U.S. 73 (2017), the Supreme Court admonished:

> In the last five years, this Court has issued a number of opinions reversing federal courts in qualified immunity cases …. Today, it is again necessary to reiterate the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.' As this Court explained decades ago, the clearly established law must be 'particularized' to the facts of the case.

*Id.* at 79 (citations omitted). As a general rule, the Eleventh Circuit looks for factually analogous binding precedent from the United States Supreme Court, the Eleventh Circuit, and the highest court of the state under which the claim arose to determine if a right is clearly established. *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011). Here, Ward has identified no factually analogous binding precedent suggesting a clearly established right to receive immediate medical care after a seemingly innocuous slip and fall resulting in no broken bones, no head trauma, no loss of consciousness, no bleeding, no stitches, and no life-threatening injury.

**B.      Eleventh Circuit precedent shows that Norton's conduct *did not* violate a clearly established constitutional right.**

The case of *Wade v. United States*, 13 F.4th 1217 (11th Cir. 2011), shows that Norton *did not* violate a clearly established right of Ward.  In *Wade*, the defendant prison captain observed an inmate's bleeding hand but placed him in a holding cell rather than taking him to the medical unit. *Id.* at 1221. The inmate was noticeably bleeding, had a broken bone, a partially severed tendon, and did not receive medical attention for several hours. *Id.* at 1223. The trial court denied qualified immunity to the prison captain, citing *Aldridge v. Montgomery*, 753 F.2d 970 (11th Cir. 1985), but the Eleventh Circuit reversed. *Id.*  Discussing *Aldridge* at length, the Eleventh Circuit explained:

> In subsequent years, we have read *Aldridge* as holding that a defendant is not entitled to a qualified immunity defense when he: (1) ignores a serious cut on an individual's head, which continued to bleed for two-and-a-half hours and form a puddle on the floor about the size of two hands, or (2) ignores a doctor's instructions for treating an injury.

*Id.* at 1227.

The Eleventh Circuit found four critical factors that materially distinguished the facts in *Wade* from *Aldridge.* First, although both cases involved allegations of obvious bleeding, it was material that "[i]n *Aldridge*, the plaintiff suffered an injury to his head – one of the most sensitive areas of the human body – whereas here, Wade suffered an injury to his hand." *Id.*  Second, unlike in *Aldridge* where the defendants observed the plaintiff continue to bleed for over two hours, in *Wade* the

prison captain was aware of the inmate's bleeding hand "during a brief 10-minute escort to the SHU, at which point he left Wade in the custody of other personnel." *Id.* Third, although the inmates in *Aldridge* and *Wade* were both bleeding, it was "critical" that in *Aldridge* the plaintiff's blood pooled on his clothing and the floor but in *Wade* it did not. *Id.* And finally:

> Captain Lewis left Wade under the supervision of other personnel who were equipped to treat Wade. Shortly after Captain Lewis and Wade reached the cell, other USP-Atlanta officers arrived, removed Wade's handcuffs, and took custody of him. Wade's holding cell was no more than three feet from the medical exam room where medical staff rendered medical care to SHU inmates. These circumstances stand in stark contrast to those in *Aldridge*, when the defendants were informed that the plaintiff required medical attention at a different location—a hospital—but ignored that need for two-and-a-half hours.

*Id.* at 1228. Based on these four "important factual distinctions," the Eleventh Circuit had "no difficulty concluding that it would not have been clear to an objectively reasonable officer in Captain Lewis's situation that his conduct violated clearly established law." *Id.*

Citing *Pearson v. Callahan*, the Eleventh Circuit in *Wade* chose not to address whether the defendant violated the plaintiff's constitutional right in the first place and instead only addressed whether the right was clearly established. *Id.* at 1225. The Eleventh Circuit's careful application of *Aldridge* to *Wade* demonstrates the high degree of factual similarity required to find a clearly established constitutional violation. A similar application to the instant case demonstrates that *Aldridge* is

materially distinguishable, and Norton did not violate Ward's clearly established constitutional right. With a bleeding hand, a broken bone, and a severed tendon, the plaintiff in *Wade* had more obvious and irrefutable evidence of injury than Ward. The plaintiff in *Wade* ultimately required surgery, while Ward received no medical treatment beyond the same mild to moderate pain reliever he received before the slip and fall. Unlike the *Aldridge* plaintiff, both Ward and the plaintiff in *Wade* suffered no head trauma. And like the defendant in *Wade*, Norton had a limited role transporting Ward between facilities to other responsible personnel with access to medical care.

C.    **The District Court erred in concluding it was "constrained" by *Patel* and *Brown* despite recognizing that *Wade v. United States* is analogous to the instant case.**

A right can be clearly established in one of three ways: (1) by showing that a materially similar case has already been decided; (2) by pointing to a broader, clearly established principle that should control the novel facts of a situation; or (3) by showing the conduct involved so obviously violates the constitution that prior case law is unnecessary. *King v. Pridmore*, 961 F.3d 1135, 1146 (11th Cir. 2020). The second and third methods are known as "obvious clarity" cases. *Id.* Obvious clarity cases constitute a "narrow exception" to the analogous case law requirement. *Dukes v. Deaton*, 852 F.3d 1035, 1043 (11th Cir. 2017). "To satisfy this narrow exception, official conduct must be so egregious that 'every objectively reasonable government

official facing the circumstances would know that the official's conduct did violate federal law.' " *Id.* (citing *Coffin v. Brandau*, 642 F.3d at 1015). "In light of the rarity of obvious clarity cases, if a plaintiff cannot show that the law at issue was clearly established under the first (materially similar case on point) method, that usually means qualified immunity is appropriate." *King v. Pridmore*, 961 F.3d at 1146.

Here, Norton's conduct was not "so egregious" to justify applying the "rare" and "narrow" exception to requiring the plaintiff identify a materially similar case on point before depriving the official of qualified immunity. A run-of-the-mill slip and fall with no obvious manifestations of significant trauma is not a novel circumstance which warrants abandoning the general principle that the clearly established prong requires factually analogous binding case law. Here, the District Court acknowledged Ward's case was similar to *Wade*, but erroneously felt "constrained" to deny qualified immunity based on cases involving "broad principle" and inapposite facts:

> The Court finds Defendant's argument persuasive that this case is similar to *Wade v. United States*, 13 F.4th 1217 (11th Cir. 2021), which held that a corrections officer who was aware that an inmate had a serious medical need, a bleeding hand that ultimately was determined to have broken bones and required surgery, and failed to obtain medical treatment for the inmate's injury was entitled to qualified immunity because it was not clearly established that he acted with deliberate indifference to the inmate's constitutional rights. Like Defendant in this case, the corrections officer in *Wade* escorted the inmate for 10 minutes to an area where the inmate had access to medical personnel and left him in the custody of other officers near medical personnel. *Id.* Nevertheless, the Court believes it is constrained by *Brown v. Hughes*

894 F.2d 1533 (11th Cir. 1990) and *Patel* [*v. Lanier County Georgia*, 969 F.3d 1173 (11th Cir. 2020)].

(Doc. 68 at 25.)

In *Patel v. Lanier County Georgia*, 969 F.3d 1173 (11th Cir. 2020), the plaintiff was a pretrial detainee transported by a deputy in an unventilated, un-air-conditioned transport van on a hot autumn day for more than two hours. *Id.* at 1178. Along the way, the deputy left the plaintiff in the van for almost an hour – without any fan or air conditioning running – while he went inside another jail to retrieve another other inmate. *Id.*

When the deputy returned to the van, he found the plaintiff lying unconscious on the floor, sweating and hyperventilating. *Id.* The deputy had to rouse the plaintiff by performing a "sternum rub" and upon waking, the plaintiff told him he passed out from the heat and asked for water. *Id.* When the drive continued the plaintiff again fell to the floor of the van where he remained unconscious, hyperventilating, with mucus and saliva running from his nose and mouth. *Id.* at 1180. The deputy never stopped for water as promised. *Id.*

Upon reaching the destination, the deputy had to again rouse the plaintiff from unconsciousness and help him to his feet. *Id.* As he waited in a holding cell, he continued to show signs of distress: he was shaking, sweating profusely, had mucus running from his nose, was still hyperventilating, and had noticeable difficulty

speaking. *Id.* The plaintiff was ultimately taken to a local hospital by ambulance, and was diagnosed with heat exhaustion, heat syncope, and panic attack. *Id.*

Noting these egregious facts, this Court in *Patel* reversed the district court's grant of summary judgment on the claim for deliberate indifference to a serious medical need, holding that the inmate's severe symptoms – particularly unconsciousness – were strong indicators of the need for immediate medical attention and that even a lay person would easily recognize the necessity for a doctor's attention. *Id.* at 1189. The Court in *Patel* found the right the plaintiff alleged was clearly established without identifying factually analogous case law because "the novel facts of the situation" were "obviously governed by a broader, clearly established principle" that "[t]he knowledge of the need for medical care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference." *Id.* at 1190 (quoting *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985)). Citing the 1985 *Ancata* decision, the Court determined that "[n]o more notice is necessary because the 'assumed circumstances here are stark and simple, and the [preexisting] decisional language . . . obviously and clearly applies." *Id.* at 1190-1191 (quoting *Bozeman v. Orum*, 422 F.3d 1265, 1274 (11th Cir. 2005)).

In the instant case, the District Court erroneously felt "constrained" to deny qualified immunity to Norton based on *Patel* despite acknowledging its facts were "far more severe" than those exhibited by Ward:

> The Court notes that the symptoms observed by the officer in *Patel* included unconsciousness, sweating, hyperventilating, shaking, profuse drooling, a severely runny nose, and difficulty speaking, which appear to be far more severe symptoms from those exhibited by Plaintiff in this case. 969 F.3d at 1189. In addition, the Defendant in *Patel* had medical training. *Id.* at 1190.

(Doc. 68 at 22.)

Erroneously "constrained" by *Patel*, the District improperly expanded the rare narrow exception allowing a "broad principle" to replace factually analogous case law to deprive qualified immunity. Here, the assumed circumstances surrounding the alleged circumstances were not "stark and simple." *See Patel* at 1190-1191. In fact, the District Court described its violation prong decision as "a very close call." (Doc. 68, p. 21). The mechanism of Ward's presumed injury was not so "novel" and Norton's conduct was not "so egregious" for this case to fall into the rare and narrow exception to the general requirement of binding case law.

*Wade* was decided after *Patel*. The defendant in *Wade*, like the defendant in *Patel*, did nothing to provide medical care to an inmate with a presumed serious medical need. But the broad principle that *Patel* gleaned from *Ancata* did not deprive qualified immunity to the defendant in *Wade*. Even though some broad principles can clearly establish a right in rare and narrow circumstances, courts must

still ground their analysis in factual similarities. The broad principle must establish with obvious clarity the unlawfulness of the official's conduct in the light of pre-existing law. *Echols v. Lawton*, 913 F.3d 1313, 1324 (11th Cir. 2019). In *Andujar v. Rodriguez*, the Eleventh Circuit observed:

> [W]hile there was caselaw establishing the general legal proposition that a government official who intentionally delays providing medical care to an inmate, knowing that the inmate has a serious medical condition that could be exacerbated by delay, acts with deliberate indifference, we cannot say that this general rule applied with obvious clarity to **the specific conduct in question**. Andujar's case does not meet this test, and thus Newcomb and Barea would be entitled to qualified immunity on this ground even if their conduct were found constitutionally impermissible.

486 F.3d 1199, 1205 (11th Cir. 2007) (emphasis added) (internal quotation marks and citations omitted). *See also Bozeman*, 422 F.3d at 1274 (noting that because "cases are highly fact-specific," a general legal proposition "ordinarily does not preclude qualified immunity in cases involving a delay in medical treatment for a serious injury").

The second case the District Court found "constraining," *Brown v. Hughes* 894 F.2d 1533 (11th Cir. 1990), is not factually analogous to the instant case. *See Wade v. United States*, 13 F.4th at 1226 (11th Cir. 2021) (recognizing that because judicial precedents are tied to particularized facts, minor variations between cases may prove critical). In *Brown*, the inmate plaintiff was attacked from behind by another inmate, a fight ensued, and the inmate suffered two broken bones in his foot

and a cut under his right eye. *Brown* at 1536. The defendant guard put the plaintiff in an isolation cell and promised to send someone to look at his foot. *Id.* But the guard did not send anyone, and the plaintiff remained in isolation for several hours before he could ask a different officer for medical attention. *Id.* In the roughly six hours that elapsed since the fight, the plaintiff's foot became so swollen that medical staff had to wait eleven days before the inflammation abated to the point that he could be fitted with a cast. *Id.*

In both *Brown* and *Aldridge*, the plaintiffs were injured in a dramatic, violent manner. Ward stepped out of a van. In both *Brown* and *Aldridge*, the plaintiffs suffered cuts to the face. The *Brown* plaintiff had two broken bones, and the *Aldridge* plaintiff lost a pool of blood the size of two hands before getting six stitches. Ward walked with a limp. Ward did not bleed. Ward had no head trauma. Ward had no broken bones. Ward had no dramatic, irrefutable, objective signs of severe injury. In *Brown*, the defendant isolated the plaintiff with a false promise that he would send medical attention while in *Aldridge*, the defendant intentionally interfered with treatment prescribed by a physician. Norton did not isolate Ward from medical personnel. Norton did not promise to send medical personnel to Ward. Norton did not fail to follow any directions of medical personnel.

**D.**     **Qualified immunity protects corrections officers like Norton while performing inherently dangerous tasks.**

Transporting multiple inmates carries inherent security risks.  The difficulties of operating a detention center must not be underestimated by the courts.  *Turner v. Safley*, 482 U.S. 78, 84-85 (1987). Corrections officers are afforded special allowance because "safety and order at these institutions requires the expertise of corrections officials, who must have substantial discretion to devise reasonable solutions to the problems they face." *Florence v. Board of Chosen Freeholders of County of Birmingham*, 566 U.S. 318, 326 (2012).  This deference extends to "[d]ecisions made at the scene of a disturbance." *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007) (quoting *Bennett v. Parker*, 898 F.2d 1530, 1533 (11th Cir. 1990)).

The purpose of qualified immunity is to allow government officials to carry out discretionary duties without the fear of personal liability, protecting from suit all but the plainly incompetent or officials who knowingly violate federal law. *Willingham v. Loughnan*, 261 F.3d 1178, 1187 (11th Cir. 2001). Here, even considering the facts in the light most favorable to Ward, the inmate slipped from a short distance and had no irrefutable signs of significant injury.  Corrections officers conducting inmate transport should not fear personal liability if second-guessed for decisions made while conducting this important and inherently dangerous discretionary function.

This Eleventh Circuit has often stated that "[p]ublic officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases." *Coffin v. Brandau*, 642 F.3d at 1015. "A reasonable official's awareness of the existence of an abstract right … does not equate to knowledge that *his* conduct infringes the right." *Id.* at 1015. It would be "inappropriate to hold government officials to a higher level of knowledge and understanding of the legal landscape than [that] displayed by judges whose everyday business it is to decipher the meaning of judicial opinions." *Denno v. Sch. Bd. of Volusia, Cnty., Fla.,* 218 F.3d 1267, 1274 (11th Cir. 2000). "If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Id.* (quoting *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997)).

## <u>CONCLUSION</u>

For the foregoing reasons, Appellant Correctional Officer Norton respectfully requests that this Court reverse the decision of the District Court and direct the entry of judgment in his favor.

Respectfully submitted this 5th day of June 2024.

/s/ W. Kevin Bledsoe
W. KEVIN BLEDSOE, ESQ.
Deputy County Attorney
Fla. Bar No.: 0029769
SARAH JONAS, ESQ.
Assistant County Attorney
Fla. Bar No.: 115989
123 W. Indiana Ave.
DeLand, Florida 32720
(386) 736-5950
Counsel for Defendant-Appellant

## CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies that this brief complies with the requirements of Fed. R. App. P. 32 and Rule 28-1 of this Court, and further certifies that the word count for the foregoing brief, as counted by the word processing system used in preparing this brief, is 8,942.

## CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2024, I electronically filed the foregoing Initial Brief with the Clerk of Court using the CM/ECF, a copy sent via U.S. Mail to Clerk of Court, 56 Forsyth Street, NW, Atlanta, GA 30303, and a copy sent U.S. Mail and electronic mail system to Samuel Weiss, Esq., 416 Florida Ave., NW, Unit 26152, Washington, DC 20001 (sam@rightsbehindbars.org).

/s/ W. Kevin Bledsoe
W. KEVIN BLEDSOE, ESQ.
Deputy County Attorney
Fla. Bar No.: 0029769
SARAH JONAS, ESQ.
Assistant County Attorney
Fla. Bar No.: 115989
123 W. Indiana Ave.
DeLand, Florida 32720
(386) 736-5950
Counsel for Defendant-Appellant